IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JORGE GONZALEZ, Individually and on Behalf of All Others Similarly Situated, | § § § | |
| *Plaintiff*, | § § | |
| vs. | § § | CIVIL ACTION NO. 4:09-CV-02946 |
| BANK OF AMERICA, N.A., BANK OF AMERICA INSURANCE SERVICES, INC., BA INSURANCE SERVICES, INC., INTERSECTIONS, INC., INTERSECTIONS INSURANCE SERVICES, INC., LOEB HOLDING, CORP., GLOBAL CONTACT SERVICES, L.L.C., AMERICAN INTERNATIONAL GROUP, INC., AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA. | § § § § § § § § § § § § § | JURY TRIAL DEMANDED |
| *Defendants*. | § | |

## CLASS ACTION COMPLAINT

Plaintiff, Jorge Gonzalez, on behalf of himself and all other persons similarly situated, alleges the following upon information and belief and investigation of plaintiff's counsel. Such investigation has included review of United States Securities and Exchange Commission ("SEC") filings by Bank of America, N.A. ("Bank of America"), Bank of America's signature cards and deposit agreements for demand deposit accounts, Bank of America's privacy policy, Bank of America bank account statements, SEC filings by Intersections, Inc. ("Intersections"), Global Contact Services' ("GCS") telemarketing transcripts, American International Group Inc.'s ("AIG") and National Union Fire Insurance Company of Pittsburgh, Pa.'s ("NUFIC") cost of insurance as publicly marketed, insurance policies, consumer reports, legislative reports, and

plaintiff's own acts and personal knowledge. Plaintiff and his counsel believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a class action. Plaintiff brings this action to recover damages and injunctive relief for himself and those similarly situated regarding the defendants' mis-use of information about the plaintiff and those similarly situated as a result of his and their opening demand deposit accounts with Bank of America.  Such information has been improperly used to foist upon the plaintiff and those similarly situated supposedly valuable, but actually essentially useless, insurance-type accidental death and disability benefits at an excessive cost, a cost that has been paid through monthly electronic withdrawals that defendants make from the deposit accounts at Bank of America of plaintiff and those similarly situated with him.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction of this action pursuant to 18 U.S.C. §1964(c) and 28 U.S.C. §1331.  The claims asserted herein arise under and pursuant to the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act ("RICO") [18 U.S.C. §1961], the Telemarketing and Consumer Fraud and Abuse Prevention Act [15 U.S.C. §§6101], the Gramm-Leach-Bliley Act [15 U.S.C. §6821], the Access Devices Regulation Act of 1998 [18 U.S.C. §1029], the Federal Wire Fraud Statute [18 U.S.C. §1343], and the Federal Mail Fraud Statute [18 U.S.C. §1341].  This Court has supplemental jurisdiction over the further claims for relief that are based on common law.

3.    Venue is proper in this District based upon the plaintiff's residence and the fact

that many of the acts giving rise to the violations complained of herein occurred and had significant effects in this District. 28 U.S.C. §1391(b); also see 18 U.S.C. §1965(a) (allowing venue in any place the defendant resides, is found, has an agent, or transacts its affairs).

## THE PARTIES

4.      Plaintiff Jorge Gonzalez ("Jorge Gonzalez" or "plaintiff") is an individual residing at 13322 Indianapolis St., Houston Texas 77015.  He brings this action in his own behalf and on behalf of all individuals similarly situated.

5.      Defendant Bank of America is incorporated in Delaware and maintains its headquarters in Charlotte, NC.  Bank of America is one of the largest banks in the United States. It provides banking and nonbanking financial services and products, including insurance related products.

6.      Defendant Bank of America Insurance Services, Inc. is a subsidiary of Bank of America and acts as a plan administrator in connection with providing insurance services.

7.      Defendant BA Insurance Services, Inc. is also a subsidiary of Bank of America that provides insurance related services.

8.      Defendant Intersections is incorporated in Delaware and maintains its headquarters in Chantilly, VA.  Intersections provides various services, but it derives the majority of its revenues from marketing and delivering products and services to demand deposit customers of banks who furnish personal information about those customers to Intersections.  Intersections uses that bank-furnished information to market, typically tele-market, purported accidental death and disability insurance to the lower income earners among those customers.  Intersections does that marketing, in its own words, to "increase [the bank's] bottom line." Its executive vice

3

president and manager of "consumer solutions" previously worked in the direct response marketing field, including at Book-of-the-Month Club and Columbia House.

9.      Defendant Intersections Insurance Services, Inc. is a subsidiary of Intersections and is engaged in marketing and selling insurance.

10.     Defendant Loeb Holding, Corp. ("Loeb") is an investment firm that owns and controls the majority of Intersections.

11.     Defendant GCS is incorporated in Delaware and maintains its headquarters in Salisbury, NC.  GCS is a telemarketing firm that sells purported insurance through "pre-acquired account telemarketing."

12.     Defendant AIG is incorporated in Delaware and maintains its headquarters in New York City, NY.  AIG, among providing other financial services and products, underwrites insurance policies.

13.     Defendant NUFIC is a subsidiary of AIG that provides and underwrites insurance, including insurance for accidental death and disability.

## FACTS

14.     Jorge Gonzalez is a young, hard-working man.  He was born in Mexico.  Spanish is his native language.  His education and his English language ability are limited.  All of that is apparent upon meeting him.  All of that was apparent to Bank of America when he opened a checking account with a modest deposit at that bank.  Little did Jorge suspect that Bank of America would use that information against him.  Little did he suspect that he was one among many who exhibited similar personal characteristics when they opened low dollar amount checking accounts with Bank of America and whom Bank of America victimized in the same

4

way it did Jorge.  In this day in which large banks such as Bank of America have squandered assets on bad loans and speculative investments, have become dependent on hand-outs from the federal government and are scrambling to restore minimally acceptable levels of capital strength, Bank of America is resorting to tapping the accounts of low level, undereducated, often Hispanic, depositors under false and predatory pretenses.

15.    Freed by the repeal of the Glass-Steagall Act to engage in numerous new non-banking lines of business, Bank of America, directly and through an array of newly formed subsidiaries, has embarked on essentially all of them.  One line of business that it has not been allowed to enter directly is the business of underwriting insurance.  Little deterred by that, and seeing opportunity for easy money from unsuspecting low dollar level depositors, Bank of America has formed subsidiaries that it has dubbed Bank of America Insurance Services, Inc. and BA Insurance Services, Inc., among others, to circumvent that limitation.  Both directly and through its insurance services subsidiaries, Bank of America has been teaming with (i) a predatory expert that operates under a variety of names and subsidiaries, including Intersections Insurance Services, Inc., but which is officially named Intersections and is substantially owned and controlled by Loeb, (ii) one or more telemarketing operations including GCS, and (iii) AIG and its affiliate, NUFIC, to extract massive amounts of money from a host of checking accounts that have been opened at Bank of America by many who mirror the profile of Jorge Gonzalez. Here is how it works.

16.    When someone meeting Jorge Gonzalez's description opens a checking account at Bank of America, the bank conveys its profile information on that person, along with the typical dollar level on deposit in his or her account and the account number, to Intersections.

Intersections then usually engages a telemarketing company, often GCS, to have a trained telemarketer, a native Spanish speaker if the depositor's profile is ethnically Hispanic, call the unsuspecting depositor at the telephone number the bank has obtained and convince the depositor to authorize, over the phone, the purchase of some form of insurance, usually supposedly covering accidental death or disability. Part of the means of such persuasion is for the telemarketer to claim to be related to Bank of America. The telemarketers are trained to trumpet the high value and low cost of the insurance protection being offered. They make the offer just too good to pass up. Although not highlighted in these sales pitches, the means of payment is to be by automatic withdrawal from the depositor's checking account at Bank of America. At the moment the telemarketer believes he or she can extract an oral "O.K." from the depositor, the telemarketer begins to record the telephone conversation. As soon as the telemarketer hears the "O.K." or its equivalent, the conversation ends, the telemarketer reports the result to Intersections, and Intersections begins to withdraw the so-called "premium" every month from the depositor's checking account at Bank of America. The withdrawals are reported on the depositor's monthly statements as having gone to "Smart Step." The victim is never told exactly who is using that name, and there is no indication that "Smart Step" has anything to do with insurance. If the telephone number for the insurance product is called, the switchboard answers in the name of "Bank of America." Only if pressed is the answerer trained to concede that Smart Step is actually Bank of America's "partner" in providing insurance, not Bank of America, itself. The answerer is trained not to disclose who, or what, "Smart Step" really is.

17.     The vast majority of the withdrawals from the depositor's checking account, however, are not used to pay any premium for insurance. Most of those withdrawals are divided

among Bank of America, Intersections, and the telemarketing firm that made the first call.  Only a small portion of the total withdrawals are paid to AIG or its subsidiary, NUFIC, as premiums for insurance coverage.

18.    The supposed insurance coverage, is, itself, almost a joke.  Although the telemarketers are trained to tout the coverage as providing extensive and large dollar coverage, the coverage that is actually provided applies only in very limited circumstances, far less than every type of accidental death or disability, and affords only modest dollar amounts of benefits except in the most unlikely sets of conditions. The victims are not even direct beneficiaries of any insurance policy.  Intersections has teamed with AIG and/or NUFIC for NUFIC to issue "Master Polic[ies]" to Bank of America as the primary "Insured."  When the victims give some semblance of a telephonic "OK" to the telemarketer, Intersections then has AIG, or its subsidiary, NUFIC, deliver what is called a "Description of Coverage" to the victim.  Even that supposed coverage is terminable if the victim ever closes his or her checking account at Bank of America. No one sends the victims a copy of the actual supposed insurance policy. The supposed "coverage" that is "descri[bed]" in the "Description of Coverage" is a pitiful excuse for insurance protection.  The amounts that supposedly will be paid are small, and the conditions to their being paid at all are highly unlikely ever to occur.  The "Description of Coverage" also contradicts the controlling "Master Policy" in numerous material respects and misrepresents the "premium" cost for the purported insurance.

19.    For practical purposes, the money taken from the victims' checking accounts is free money to the participants in the scheme.  Intersections does not even refer to the victims as its clients.  That reference is reserved for Bank of America (and other financial institutions who

7

participate with Intersections). The victims are referred to as "consumers." Those references are fitting in light of whose interests are being served. By an extremely large margin, Bank of America is Intersections' largest "client" under this scheme.

20.    As measured by the dollars withdrawn from the victims' checking accounts, the victims pay a multiple of the actual cost of the insurance they are provided. As stated, most of the dollars the victims pay are divvied up among the primary promoters of the scheme, Bank of America and Intersections. By comparison, AIG offers University of California employees, certainly a smaller pool of insureds than the Bank of America pool, more coverage at less than half the cost to plaintiff and members of the class.

21.    With the host of victims at Bank of America's disposal and the vast numbers of actual victims, even though the dollars for each individual victim are small, the dollars involved in the aggregate are enormous. For example, Intersections had over 4.5 million "subscribers" in 2007 and over 5.2 million "subscribers" in 2008. From them it derived over $236 million in revenues in 2007 and over $361 million in revenues in 2008. Those amounts do not even include the portion of the funds extracted from the checking accounts of participating financial institutions such as Bank of America that are remitted to AIG or NUFIC for the supposed insurance coverage that is purportedly being sold. Approximately 33% of Intersections' revenues in 2007 were derived from accounts at Bank of America. The percentage of those total revenues that were obtained from accounts at Bank of America in 2008 was 48%. It is no wonder that ever since 2006, Bank of America has financed Intersections' operations to the tune of a $40 million credit agreement, so Bank of America not only reaps significant cash benefits from participating directly in the scheme with Intersections, Bank of America benefits further from the cost to

Intersections for that central financing facility. That financing also enables Intersections to perpetuate the overall scheme.

22.     To provide some idea of what Bank of America is paid for participating in this scheme, for doing no more than profiling its customers for Intersections and permitting Intersections to withdraw funds from its customers' accounts, in 2008 Intersections paid "commissions" to its financial institutional "clients" equaling almost 25% of its revenues.  Bank of America in 2008, measured by the above described percentages, received almost $45 million out of the checking account deposits of its poorest customers. Naturally, Bank of America reveals none of this to those customers.  It just takes their money.

23.     For Intersections' part, after paying Bank of America (and the other of its financial institutional "clients") and after paying its telemarketers and all of its expenses, Intersections kept over $11.7 million of the money it withdrew from the victims' checking accounts in 2007 and over $12.2 million that it took from those accounts in 2008.  After paying AIG and NUFIC the meager amounts for the "premium" for the supposed insurance coverage, there has been plenty of money to go around among those who concocted and who continue to perpetuate the scheme.

24.     The success of the scheme, of course, depends on Bank of America's identifying its most vulnerable checking account owners. It also depends on deceptive and fraudulent practices.  For example, Bank of America is limited by federal statute in the extent to which it can reveal information it receives from its customers to the likes of Intersections.  It cannot reveal that information at all unless it obtains its customers' consent to do so.  The same statute, however, allows Bank of America to reveal that information on a limited basis if it obtains its

customers' consent. The victims of the scheme with Intersections, of course, would not provide that consent if they knew their profile information was going to be used as Intersections uses it. So, Bank of America has to obtain the victims' supposed consent through deception. There are a series of steps to that deception.

25.    First, when an individual who fits the victim profile opens a checking account at Bank of America, he or she signs a single sheet of paper. That signature is required for the bank to know who is authorized to sign checks on the account. For Bank of America, though, that signature also allows Bank of America to claim that the victim has agreed to all the terms of a "Deposit Agreement" that is mentioned in the fine print of the single sheet. That "Deposit Agreement" refers to Bank of America's "Privacy Policy for Consumers." The terms of that "Privacy Policy for Consumers" are not stated in the "Deposit Agreement" that is referred to in the sheet the victim signs. Instead, those terms are tucked away through links in Bank of America's website on the Internet. Bank of America points to that "Privacy Policy for Consumers" as its way of satisfying the requirements of the applicable federal law.

26.    It is highly unlikely that any prospective victim ever sees either the "Deposit Agreement" that refers to the "Privacy Policy for Consumers" or the "Privacy Policy for Consumers," itself, but, when it comes to victimizing its depositors, Bank of America does not even comply with what it represents in the "Privacy Policy for Consumers" are its practices with the information it obtains from its depositors.

27.    First, even to reach the "Privacy Policy for Consumers" on Bank of America's website, one first encounters representations such as "Our Products Are Secure," and Bank of America's description of itself as "Your privacy and security partner" who is "Protecting your

10

information" and who "value[s] your privacy as if it were our own."  Bank of America begins its

deceptive statements in its "Privacy Policy for Consumers" by representing:

> "Unlike many other financial institutions, Bank of America does not sell or share
> any Customer Information with marketers outside Bank of America who may
> want to offer you their own products and services.  You don't need to take any
> action for this benefit."

In perpetuating its scheme with Intersections, however, Bank of America does precisely what it

represents in this "Privacy Policy for Consumers" it will not do.  And the deception does not stop

there.

28.    Bank of America goes on to say, "Keeping financial information secure is one of

our most important responsibilities. ... We collect and use various types of information to service

your accounts, save you time and money, better respond to your needs, and mange our business

and risks."  After providing those broad assurances, Bank of America then begins to hedge, but it

does so within misleading boundaries.  Under the heading "Managing Information", Bank of

America mentions that it "may" share "Customer Information ***among our companies***."

(emphasis added).  It then says it "may share" Customer Information "with companies that work

***for us***", but when it does, it is "***only*** to provide the services we ask them to perform ***for you and

us***."  (emphasis added).  Those services then are represented to be "in order to service your

accounts, ***better meet your financial needs***, and manage our business and risks." (emphasis

added).  Bank of America repeats in section 7 of its "Privacy Policy for Consumers" that "Bank

of America does not sell or share any Customer Information with marketers outside Bank of

America who may want to offer you their own products and services."  In section 8 of its

"Privacy Policy for Consumers," Bank of America purports to list the "companies that have

11

consumer customer relationships with Bank of America." That list does not mention Intersections, Loeb Holdings Corp. or any subsidiary of Intersections, including Intersections Insurance Services, Inc., AIG, or NUFIC. What it does mention is "BA Insurance Services, Inc." and "Bank of America Insurance Services, Inc." among several other apparently insurance-oriented subsidiaries. What Bank of America does through this maze of deception is to provide the prospective victims' profiles to one of its insurance-related subsidiaries and relies on those subsidiaries to pass it along to the likes of Intersections or its subsidiaries so the scheme can unfold. It is structured so the victims can never figure out what is going on.

29.     All of the funds electronically withdrawn from the Bank of America accounts of the plaintiff and those similarly situated with him were procured by the defendants' wrongful conduct as detailed above. The plaintiff and those similarly situated with him have been damaged by such wrongful conduct in at the amounts withdrawn from their accounts at Bank of America during the Class Period or, alternatively, by at least the amounts by which those withdrawals exceed the reasonable premium value of the supposed insurance coverage provided for them.

## CLASS ACTION ALLEGATIONS

30.     The class is composed of the plaintiff and all those who (i) have opened or maintained demand deposit accounts at Bank of America, N.A., (ii) since June 9, 2006, (iii) with average monthly balances of less than $5,000 (or the amount targeted by Bank of America and/or Intersections), (iv) whose personal information Bank of America or one or more of its subsidiaries has provided to Intersections or any of its subsidiaries, (v) who have been telephoned by a representative or contracted agent of Intersections or by one of its subsidiaries, or by GCS, to telemarket supposed accidental death or disability insurance coverage, (vi) from whose

12

demand deposit accounts at Bank of America funds for supposed premiums for such supposed insurance benefits have been electronically withdrawn and (vii) who have been extended supposed accidental death and/or disability insurance type coverage by AIG or NUFIC.

31.    The foregoing class includes a sub-class composed of the plaintiff and all those who meet the Class Definition set out immediately above and (i) who have not earned a college degree, (ii) who are ethnically Hispanic and (iii) whose native language is Spanish.

32.    The members of the class and sub-class are so numerous that joinder of all members is impracticable.  Class members are located throughout the United States.  Bank of America in 2008, as a result of the scheme described herein, received almost $45 million out of the checking account deposits of its poorest customers.  Intersections kept over $11.7 million of the money it withdrew from the victims' checking accounts in 2007 and over $12.2 million that it took from those accounts in 2008.  Since the amount of a typical demand draft withdrawal was relatively small, it is reasonable to believe the class numbers in the thousands, if not tens of thousands.

33.    Plaintiff is an adequate representative of the class and his claims are typical of those of the class.  He has no conflicts with the members of the class.  Counsel for the plaintiff are adequate to the task. They are experienced in handling complex class action litigation and have appeared as counsel and as lead counsel in nationwide class actions.

34.    There are questions of law and fact that are common to the class and that predominate over any issues affecting only individual members. Common questions of fact include the use of mail and wires to fraudulently obtain and disclose Bank of America customers' account information, the transmission of such fraudulently obtained and disclosed account

information to conduct fraudulent pre-acquired account telemarketing and execute fraudulent automatic withdrawals, selling purported insurance at excessive cost to low income victims, falsely claiming the premium for such insurance was the same amount as the monthly withdrawals from victims' bank accounts, participating in an enterprise engaged in a pattern of racketeering activity, and the common knowledge of the defendants as essential parties to the scheme. Common questions of law include whether defendants violated 18 U.S.C. §§1962(c), 1341, and 1243, 15 U.S.C. §§6101, and 6821, whether Bank of America, Bank of America Insurance Services, Inc., BA Insurance Services, Inc., AIG and NUFIC conspired with the one or more of the other defendants in violation of 18 U.S.C. §1962(d), whether Bank of America breached its contract with the members of the plaintiff class, whether Bank of America breached its fiduciary duties, whether the defendants committed fraud, and whether the defendants have been unjustly enriched.

35.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The individual claims of the class members are too small, and the legal issues too complex, to warrant their bringing individual claims.  To the best of plaintiff's knowledge there is no other action brought on behalf of the class against the defendants.  There should be no difficulties in the management of this action as a class action, since most of the information needed should be readily obtainable by discovery from Bank of America, Intersections, GCS, AIG, and/or NUFIC.

## CLAIMS FOR RELIEF

## COUNT I:  VIOLATIONS OF RICO [18 U.S.C. §1962(c)] (ALL DEFENDANTS)

36.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth in this Count.

37.     Bank of America, Bank of America Insurance Services, Inc., BA Insurance Services, Inc., Intersections, Intersections Insurance Services, Inc., Loeb, GCS, AIG, and NUFIC are entities capable of holding legal or beneficial ownership interest in property and are therefore persons as defined in 18 U.S.C. §1961(3).

38.     Bank of America, Bank of America Insurance Services, Inc., BA Insurance Services, Inc., Intersections, Intersections Insurance Services, Inc., Loeb, GCS, AIG, and/or NUFIC constitute an enterprise-in-fact as defined in 18 U.S.C. §1962(4).

39.     Bank of America, Bank of America Insurance Services, Inc., BA Insurance Services, Inc., Intersections, Intersections Insurance Services, Inc., Loeb, GCS, AIG, and NUFIC have participated in the conduct of the affairs of an enterprise identified in paragraph 38 since at least June 9, 2006 through a "pattern of racketeering activity" as that phrase is defined in 18 U.S.C. §1961(5).

40.     Each of the entities described above is an essential element in the common fraudulent enterprise whereby Bank of America, directly and through its subsidiaries, Bank of America Insurance Services, Inc. and  BA Insurance Services, Inc, teamed with (i)  Intersections, a predatory marketing expert that operates under a variety of names and subsidiaries, including Intersections Insurance Services, Inc., (ii) Loeb, Intersections' controlling parent, (iii) telemarketers, including GCS, and (iv) AIG and its affiliate, NUFIC, to extract by means of

15

fraudulent pretenses, misrepresentations, and false promises, massive amounts of money from a host of checking accounts that have been opened at Bank of America by customers who mirror the profile of Jorge Gonzalez.  Each of the entities described above had knowledge of, or willful disregard for, their own and/or the other entities' predicate and ongoing criminal acts that constitute a pattern of racketeering activity.  The predicate criminal acts include violations of the Telemarketing and Consumer Fraud and Abuse Prevention Act prohibitions of certain telemarketing activity, the Gramm-Leach-Bliley Act prohibitions of disclosure, attempts to disclose, obtaining, and attempts to obtain, customer's financial information by making false statements or misrepresentations, the Access Devices Regulation Act of 1998 prohibitions of the use and possession of unauthorized account numbers, and the federal statutes that prohibit mail fraud and wire fraud.

41.     Here's how the common fraudulent enterprise basically works.  Since at least June 9, 2006, Bank of America, with the knowledge of or willful disregard for Intersections' predatory criminal marketing schemes, directly and through its subsidiaries Bank of America Insurance Services, Inc. and BA Insurance Services, Inc., deceptively and fraudulently obtains the personal information of vulnerable Bank of America checking account owners who mirror the profile of Jorge Gonzalez and provides this information to Intersections.  Intersections, with the knowledge of or willful disregard for Bank of America's criminal conduct described herein, then usually engages a telemarketing company, often GCS, to have a trained telemarketer, a native Spanish speaker if the depositor's profile is ethnically Hispanic, to call the unsuspecting depositor at the telephone number Bank of America has deceptively and fraudulently obtained and convince the depositor through fraudulent practices to authorize, over the phone, the purchase of some form of

insurance, usually supposedly covering accidental death or disability. With knowledge of or willful disregard for the criminal acts described herein, AIG and its affiliate, NUFIC provide the supposed insurance coverage for the scheme which is, itself, almost a joke.

***Predicate Violations of the Telemarketing and Consumer Fraud And Abuse Prevention Act***

42.    Telemarketing refers to the use of the telephone to advertise, market, and/or sell products and services to both individual consumers and businesses.

43.    By its nature, telemarketing is susceptible to being used by unscrupulous persons and companies, including but not limited to defendants, to defraud consumers, such as plaintiff and the members of the class, including schemes to obtain information concerning bank accounts to automatically and surreptitiously withdraw money. Telemarketers, including GCS, use false, misleading and high-pressure sales scripts to induce victims such as plaintiff and the members of the class to agree to purchase products and services of negligible or wildly exaggerated value, such as the subject insurance products.

44.    These defendants are engaged in a telemarketing sales practice referred to as "pre-acquired account telemarketing." After profiling low income victims, Bank of America discloses and/or sells the victims' financial information to provide the telemarketers the ability to charge bank customers' accounts without obtaining the written consent or approval of the customer. This form of telemarketing presents inherent opportunities for deception and consumer confusion, especially in the context of a free-to-pay conversion feature. The telemarketing scripts emphasize a free trial and include promises like, "nothing will be charged from your Bank of America checking account today." The victims are then "enrolled," receive a "Description of Coverage," receive a certificate, and even receive insurance coverage on an

effective date before the free product converts to require payment and the first "premium" is withdrawn from the victim's account.

45.    In contrast, a telemarketing sale that does not involve pre-acquired account information typically requires that the consumer provide his or her credit card account number to the telemarketer, that the consumer either send a check or sign a contract in a later transaction.  Other than when a consumer pays cash, accepted methods by which a consumer confirms his or her consent to a transaction is to sign an agreement, provide a credit card number or provide an account number.  For many consumers, withholding their credit card number, account number, or signature from the telemarketer is their ultimate defense against unwanted charges from telemarketing calls.

46.    Pre-acquired account telemarketing removes the consumer's ability to control when he or she has agreed to purchase goods or services and to have their account debited.  The telemarketers with pre-acquired account information from Bank of America turn the regular practice on its head.  Bank of America not only provides Intersections and the telemarketers, including GCS, with the ability to charge Bank of America customers' bank accounts, Bank of America, on information and belief, also allows the telemarketers, including GCS, to decide whether the victim has actually consented to the transaction.

47.    The Telemarketers and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§6101, authorized the adoption of rules by the Federal Trade Commission ("FTC") to prevent deceptive and abusive telemarketing acts or practices. 15 U.S.C. §6102(a). The FTC has implemented this mandate by promulgating the Telemarketing Sales Rule ("TSR"), 16 C.F.R. §310.

48. The TSR defines telemarketing as "a plan, program, or campaign which is conducted to induce the purchase of goods or services by use of one of more telephones and which involves more than one interstate call." 16 C.F.R §310.2(cc).  The scheme in which the defendants engage includes "telemarketing" as regulated by the TSR.

49. The TSR defines a telemarketer as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R §310.2(bb).  By this definition, Intersections and its subsidiaries and GCS are "telemarketer[s]" within the meaning of the TSR.

50. The TSR defines a seller as "any person who in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. §310.2(z).  By the conduct described herein, all defendants are "seller[s]" within this definition of the TSR.

51. The TSR further makes actionable assisting or facilitating violations of the TSR. The TSR provides that it is a violation "for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§310.3(a) or (c), or §310.4 of this Rule." 16 C.F.R §310.3(b).

52. By acting as sellers under the TSR and/or providing substantial assistance or support to telemarketers, all defendants knew or consciously avoided knowing, that those telemarketers were and are knowingly and willfully engaging in acts or practices that violate the TSR.  All of the transactions described above regarding deceptive telemarketing offers and sales constitute multiple, separate violations of the TSR, including 16 C.F.R. §§310.3(a)(1)(i)-(iii)

(failing to disclose material information), 310.3(a)(2)(i), (ii), (iv), and (vii) (misrepresenting, directly or by implication, material information), 310.3(a)(4) (making a false or misleading statement to induce any person to pay for goods or services), 310.4(a)(6)(i) (failing to obtain from the customer the last four digits of the account number to be charged), and 310.4(d)(1) (failing to disclose in a clear and conspicuous manner the identity of the sellers).

53.    For example, the telemarketers fail to disclose that the victims must pay premiums for several years before the coverage amounts described in the sales call applies, fail to disclose the exclusions in the description of coverage and/or master policies, misrepresent the cost for premiums, misrepresent the coverage amounts, fail to obtain from the victim the last four digits of the account number to be charged despite the purported insurance products including a free-to-pay conversion feature, and fail to disclose in a clear and conspicuous manner the identity of the sellers.

54.    The conduct described in paragraphs 44, 52 and 53 above constitutes multiple violations of The Telemarketers and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101, *et seq.*, which are all criminal acts under 5 U.S.C. §1611 and are predicate offenses for the purposes of 18 U.S.C. §1962(c).

***Predicate Violations of the Gramm-Leach-Bliley Act***

55.    Bank of America, directly and through its subsidiaries, Bank of America Insurance Services, Inc. and BA Insurance Services, Inc., has caused to be disclosed, or attempted to cause to be disclosed, customer information of a financial institution by means of false, fictitious, or fraudulent statements or representation to a customer of a financial institution as described in this complaint.  Intersections, directly and through its subsidiary Intersections

20

Insurance Services, Inc., and at the behest of its controlling parent, Loeb, GCS, AIG and NUFIC have obtained, or attempted to obtain, customer information of a financial institution by means of false, fictitious, or fraudulent statements or representation to a customer of a financial institution or by requesting that a person obtain customer information of a financial institution, knowing that the person will obtain, or attempt to obtain, the information by means of false, fictitious, or fraudulent statements or representation.  Such misrepresentations include by way of example:

(a)     Bank of America's Privacy Policy claims, "Unlike many other financial institutions, Bank of America does not sell or share any Customer Information with marketers outside Bank of America who may want to offer you their own products and services.  You don't need to take any action for this benefit.";

(b)     Bank of America's Privacy Policy promises to disclose customers' financial information only "in order to service your accounts, ***better meet your financial needs***, and manage our business and risks." (emphasis added);

(c)     Despite its promises to support and benefit its customers, Bank of America's disclosure of customers' financial information that mirrors plaintiff's financial information to market purported insurance products with limited coverage at an excessively high cost is not for the customer's benefit -- it is for Bank of America's benefit;

(d)     Despite Bank of America's policy that it may disclose financial information provided by a customer to Bank of America, in no event does Bank of America provide any notice that it may disclose a customer's bank account number;

(e)     GCS falsely claims to be Bank of America;

(f)     GCS falsely claims one of the subject insurance products is being offered "during this call only";

(g)     GCS falsely enrolls victims as insureds despite the customers' wanting only to receive insurance related documents describing coverages and exclusions; and

(h)    None of the defendants identifies the subject insurance products as products from, or offered through the name, "Smart Step", but only that name appears on the victims' account statements.

56.    The conduct described in paragraph 55 above constitutes multiple violations of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6802(d) and 6821, which are all criminal acts under 15 U.S.C. §6823 and are predicate offenses for the purposes of 18 U.S.C. § 1962(c).

***Predicate Violations of the Access Devices Regulation Act of 1998***

57.    Plaintiff incorporates by reference the allegations set forth in all proceeding and following paragraphs as if fully set forth in this Count.

58.    Plaintiff's and the members of the class' account numbers are "access devices" as that term is defined in 18 U.S.C. §1029(e)(1). Those access devices are obtained by Intersections and related telemarketers, including GCS, with intent to defraud as alleged above. The victims' account numbers were, therefore, "unauthorized access devices" as that phrase is defined in 18 U.S.C. §1029(e)(3).

59.    Intersections and the telemarketers, including GCS, knowingly and with intent to defraud, traffic in and use many thousands of unauthorized access devices during a one-year period, and by such conduct, obtain funds from plaintiff and members of the class aggregating in the millions of dollars.  Intersections and the telemarketers, including GCS, with intent to defraud, also possess and have possessed many thousands of unauthorized access devices.

60.    The conduct of Intersections and the telemarketers, including GCS, constitute multiple violations of 18 U.S.C. §§1029(a)(2) and (a)(3).

61.    Bank of America, directly and through its subsidiaries, AIG and NUFIC, with

knowledge of the criminal conduct of Intersections and the telemarketers, including GCS, or with willful disregard thereof, agrees to provide bank customers' account information, provides purported insurance products and/or services, and accepts payment via the unauthorized access devices.

62.     The conduct of Bank of America, its subsidiaries, AIG and NUFIC, through Intersections and the related telemarketers, including GCS, constitute multiple violations of 18 U.S.C. §§1029(a)(2) and (a)(3).

63.     Bank of America, its subsidiaries, AIG and NUFIC conspired with each of Intersections and its subsidiaries and controlling parent, Loeb, and the telemarketers, including GCS, to commit the unauthorized access device offenses, in violation of 18 U.S.C. §1029(b)(2), which conspiracies are predicate offenses for purposes of 18 U.S.C. §1962(c).

***Predicate Violations of Wire Fraud Statute***

64.     Bank of America, directly and through its subsidiaries Bank of America Insurance Services, Inc. and BA Insurance Services, Inc., Intersections and its subsidiary, Intersections Insurance Services, Inc., at the behest of their controlling parent, Loeb, GCS, AIG, and NUFIC, have sent through, and received, materials by interstate wire as part of the scheme and artifice to defraud and have obtained money for themselves by means of the false and fraudulent pretenses, promises, and representations described in this complaint. Such use of interstate wires includes by way of example:

> (a)    Since at least June 9, 2006, telemarketers directed by Intersections and/or its subsidiaries and controlling parent, Loeb, including its own agents and contract representatives such as GCS, have contacted plaintiff and members of the plaintiff class via the telephone to convince them through fraudulent practices to authorize, over the phone, the purchase of some form of insurance, usually supposedly covering accidental death or

disability, to implement and perpetuate the insurance scheme detailed herein;

(b)     On information and belief, e-mails and electronic wire communications have   been sent since at least mid 2006, by and among Bank of America, directly and    through its subsidiaries, Bank of America Insurance Services, Inc. and BA Insurance Services, Inc, and Intersections, directly and through its subsidiaries   and/or their controlling parent, Loeb, and GCS, AIG, and NUFIC, to convey the information profiling vulnerable target depositors of Bank of America, to train telemarketers how to communicate with the identified targets, to withdraw funds electronically from the plaintiff's and class members' deposit accounts, and to divvy those funds up among the participants in the scheme, all to implement and perpetuate the insurance scheme detailed herein;

(c)     Bank of America has posted on the Internet numerous misrepresentations about   its privacy policy, its security protections for its depositors, and its commitment to offer products and services only in support of the depositors' best interests as detailed in this complaint; and

(d)     Intersections electronically withdraws payments that far exceed the real premium cost for the purported insurance product, every month, from the victims' bank accounts at Bank of America.

65.     The conduct described in paragraph 64 above constitutes multiple violations of 18 U.S.C. §1343, which is a predicate offense for the purposes of 18 U.S.C. §1962(c).

***Predicate Violations of Mail Fraud Statute***

66.     Bank of America, directly and through its subsidiaries Bank of America Insurance Services, Inc. and BA Insurance Services, Inc., Intersections and its subsidiary, Intersections Insurance Services, Inc., at the behest of their controlling parent, Loeb, GCS, AIG, and NUFIC have sent and received material by use of the federal postal system as part of the scheme and artifice to defraud and obtain money for themselves by means of false and fraudulent pretenses, promises, and representations described in this complaint.  Such use of the federal postal system has included by way of example:

24

(a)     Participants in the above-described scheme have mailed copies of "Description[s] of Coverage" and communications regarding those supposed coverages to plaintiff and class members that are integral to implementing the foregoing described scheme and that misrepresent the terms of the controlling master policies; and

(b)     On information and belief, letters, invoices, and payments have been mailed by and among the defendants, and reports have been mailed by participants in the foregoing described scheme to regulatory authorities, since at least as early as June 9, 2006, to implement and perpetuate the scheme detailed herein.

67.     The conduct described in paragraph 66 above constitutes multiple violations of 18 U.S.C. §1341, which is a predicate offense for the purposes of 18 U.S.C. §1962(c).

**Alternative Allegations of RICO Violations by Bank of America Entities, AIG, and NUFIC**

68.     In the alternative, Bank of America, Bank of America Insurance Services, Inc., BA Insurance Services, Inc., AIG, and NUFIC conspired with Intersections, Intersections Insurance Services, Inc., their controlling parent, Loeb, and GCS, to violate 18 U.S.C. §1962(c), in violation of 18 U.S.C. § 1962(d).

69.     Bank of America, Bank of America Insurance Services, Inc., BA Insurance Services, Inc., AIG, and NUFIC joined the conspiracy when they entered an agreement with Intersections and/or GCS to market and sell purported insurance to low income bank customers at an excessive cost. Bank of America, Bank of America Insurance Services, Inc., BA Insurance Services, Inc., AIG, and NUFIC knew that doing so violated Bank of America's privacy policy and would not benefit its customers.  Bank of America and its subsidiaries also knew that Intersections and GCS would target low income customers as victims and sell purported insurance through "pre-acquired account telemarketing," fail to confirm the victims' account numbers, misrepresent other material information such as coverage and real premium cost as

25

described above, hide the sellers' identities during the telemarketing calls and on the victims' bank statements, and send descriptions of coverage to the victims that are inconsistent with the master policies kept by Bank of America, AIG, and/or NUFIC.

70.     On information and belief, Bank of America, Bank of America Insurance Services, Inc., BA Insurance Services, Inc., AIG, and NUFIC were also aware that the insurance products sold through Intersections and the telemarketers, including GCS, were attended by a high cancellation rate.  Bank of America, Bank of America Insurance Services, Inc., BA Insurance Services, Inc., AIG, and NUFIC also certainly observed and received countless complaints regarding the fraudulent telemarketing practices of Intersections and the telemarketers, including GCS.  Bank of America, Bank of America Insurance Services, Inc., BA Insurance Services, Inc., AIG, and NUFIC were also aware that websites and internet message boards are riddled with complaints and warnings about the fraudulent scheme described herein. In fact, if one "googles" "Smart Step Insurance" today, the first eight results are links to extensive complaints of fraud.  Bank of America, Bank of America Insurance Services, Inc., BA Insurance Services, Inc., AIG, and NUFIC were also aware that Citibank, N.A. and Discover Financial Services severed their business relationships with Intersections.

71.     Notwithstanding their actual knowledge and the knowledge and information available to them as alleged above, Bank of America, Bank of America Insurance Services, Inc., and/or BA Insurance Services, Inc. provided essential elements in the scheme to fraudulently obtain funds from the bank accounts of plaintiff and the members of the class, including but not limited to, financing Intersections, providing the victims' account numbers to Intersections and/or GCS, and acting as a plan administrator for the purported insurance policies that conflict

26

with descriptions of coverage sent to plaintiff and members of the class.

72.     AIG and NUFIC also provided essential elements in the scheme to fraudulently obtain funds from the bank accounts of plaintiff and the members of the class, including but not limited to, the purported insurance with negligible coverage, aggressive loss ratio, and excessive cost.

73.     For the reasons stated above, Bank of America, Bank of America Insurance Services, Inc., BA Insurance Services, Inc., AIG, and NUFIC were on notice of and knew of the unlawful scheme being perpetrated by Intersections and the telemarketers, including GCS, as alleged herein, but nonetheless conspired, agreed to facilitate the scheme, and committed acts in furtherance of the scheme, all in violation of 18 U.S.C. §1962(d).

74.     Plaintiff and the members of the class were the intended targets of the scheme that was facilitated by the knowing and purposeful involvement of Bank of America, Bank of America Insurance Services, Inc., BA Insurance Services, Inc., AIG, and NUFIC.  The financial harm suffered by plaintiff and class members was by reason of said conduct and was the reasonably foreseeable consequence of such conduct.

## COUNT II:  BREACH OF CONTRACT (BANK OF AMERICA)

75.     Plaintiff incorporates by reference the allegations set forth in all proceeding and following paragraphs as if fully set forth in this Count.

76.     Bank of America opened a demand deposit account for plaintiff and the class members and accepted deposits from plaintiff and the class members into those accounts. In opening those accounts, Bank of America became obligated both explicitly and implicitly to comply with certain constraints, not the least of which were to permit withdrawals from those

accounts only upon the depositors' authorization, but also to comply with its own announced "Privacy Policy for Consumers," all federal statutes and regulations pertaining to national banks, and its own representations that it would act only in support of the depositors interests, especially regarding use of the depositors' private personal information.

77.    As detailed in this complaint, Bank of America, directly and through its subsidiaries, breached all of those obligations. Bank of America, directly and through its subsidiaries, also violated their implicit obligation of good faith and fair dealing owed to their depositors.

78.    Any and all conditions precedent to plaintiff's and the class' right to be compensated for the damages Bank of America has caused have been performed or have occurred.  Bank of America's breach of its agreement has caused plaintiff and the class members to suffer damages in an amount to be proven at trial.

## COUNT III:  BREACH OF FIDUCIARY DUTY (BANK OF AMERICA)

79.    Plaintiff incorporates by reference the allegations set forth in all proceeding and following paragraphs as if fully set forth in this Count.

80.    Bank of America assumed the duties of a fiduciary toward plaintiff and the class members by promising and agreeing to serve as his and their "privacy and security partner," by pledging to keep plaintiff's and the class members' financial information "secure," and to use their private personal information to "better meet your financial needs."

81.    Bank of America breached its fiduciary duty to plaintiff and to the class members by disclosing their personal and private information to Intersections in furtherance of the scheme detailed above and by failing to disclose Bank of America's own profits or conflict of interest to

its fiduciaries.

82.    Bank of America's breach of its fiduciary duty to Plaintiff and the Class Members resulted in Bank of America's receiving fees and "commissions" from the sale of the purported insurance products to the plaintiff and class members and caused the plaintiff and class members to suffer damages in an amount to be proven at trial.

## COUNT IV:  COMMON LAW FRAUD (ALL DEFENDANTS)

83.    Plaintiff incorporates by reference the allegations set forth in all proceeding and following paragraphs as if fully set forth in this Count.

84.    Bank of America, directly and through its subsidiaries Bank of America Insurance Services, Inc. and  BA Insurance Services, Inc., Intersections, directly and through Intersections Insurance Services, Inc., and their controlling parent, Loeb, GCS, AIG, and NUFIC, as participants in an enterprise to provide purported insurance products to plaintiff and the class members, owed them a legal duty to be honest with them and to refrain from inducing them into any action by way of false representations or, once having communicated to them what purported to be facts, not to omit disclosing any material facts whose omission would be misleading.

85.    Bank of America, directly and through its subsidiaries Bank of America Insurance Services, Inc. and BA Insurance Services, Inc., Intersections, directly and through Intersections Insurance Services, Inc., and their controlling parent, Loeb, GCS, AIG, and NUFIC breached their legal duty of honest and adequate disclosure to plaintiff and the class members by participating, and encouraging each other to participate, in the fraudulent scheme detailed above.

86.    Bank of America, directly and through its subsidiaries Bank of America Insurance Services, Inc. and  BA Insurance Services, Inc., Intersections, directly and through Intersections

Insurance Services, Inc.,  and their controlling parent, Loeb, GCS, AIG, and NUFIC breached their legal duty to plaintiff and the class members, intended thereby to induce plaintiff and the class members to rely on the defendants' misrepresentations and material omissions, and plaintiff and the class members did so rely to their detriment and suffered damages in an amount to be proven at trial.

## COUNT V:  UNJUST ENRICHMENT (ALL DEFENDANTS)

87.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth in this Count.

88.    Defendants have been unjustly enriched at plaintiff's and the class members' expense by misappropriating, disclosing, selling and wrongfully capitalizing on private and confidential personal information of and about plaintiff and the class members in the ways and for the purposes described in this complaint.  They have obtained and unjustly retained funds improperly withdrawn from the plaintiff's and class members' deposit accounts at Bank of America, to plaintiff's and the class members' detriment.  Obtaining and retaining those funds as alleged herein violate fundamental principles of justice, equity, and good conscience.

## ATTORNEYS' FEES

89.    Plaintiff and class members have necessarily incurred reasonable expenses for the professional services of the undersigned to prepare and prosecute this lawsuit.  Having complied with all prerequisites for recovery of attorneys' fees and costs, plaintiff is entitled to judgment against Bank of America for those expenses in a reasonable amount.  TEX. CIV. PRAC. & REM. C. § 38.002.

## EXEMPLARY DAMAGES

90.    Plaintiff and class members also seek recovery of treble damages pursuant to 18

U.S.C. §1964(c) and exemplary damages in an amount to be determined by the jury pursuant to

TEXAS CIVIL PRACTICE & REMEDIES CODE §41.003.

## JURY DEMAND

91.    Plaintiff demands a trial by jury on all issues of fact to which plaintiff is entitled.

## PRAYER

WHEREFORE, plaintiff, on behalf of himself and the members of the class, prays for

judgment as follows:

(a)    Declaring the action to be a proper class action and designating plaintiff as the
representative;

(b)    Awarding plaintiff and members of the class all relief to which they are entitled
under the law pursuant to FEDERAL RULE OF CIVIL PROCEDURE 54(c) and as a
result of defendants' unlawful conduct as alleged herein;

(c)    Awarding plaintiff and members of the class their costs and expenses incurred in
this action, including reasonable attorneys' fees;

(d)    Pre-and post-judgment interest; and

(e)    Granting such other and further relief as the Court may deem just and proper.

Respectfully submitted,


 /s/  Kenneth R. Wynne

Kenneth R. Wynne (**Attorney-In-Charge**)
Fed. Bar No. 837
TBA No. 22110000
David E. Wynne
Fed. Bar No. 566468
TBA No. 24047150

31

WYNNE & WYNNE LLP
711 Louisiana, Suite 2010
Pennzoil Place, South Tower
Houston, TX 77002
Telephone: (713) 227-8835
Facsimile: (713) 227-6205 (fax)
kwynne@wynne-law.com


John F. Sullivan, III
State Bar No.  19485010
Federal Bar No. 9761
1800 Pennzoil Place - South Tower
711 Louisiana, Street
Houston, TX  77002
Telephone: (713) 650-8100
Facsimile: (713) 650-8141

**ATTORNEYS FOR PLAINTIFF AND
PLAINTIFF CLASS**