UNITED STATES DISTRICT COURT        SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Jorge Gonzalez, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| *versus* | § | Civil Action H-09-2946 |
| | § | |
| Bank of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## Opinion on Dismissal

1.      *Introduction.*

      A man accuses Bank of America and eight other companies of having done something wrong when they offered customers like him insurance, some of whom agreed to buy it.  He has described nothing more than a business arrangement that people willingly and knowingly agreed to enter.  His case will be dismissed.

2.      *Gonzalez's Allegations.*

      Jorge Gonzalez has sued Bank of America,  NA, and eight other companies for selling accidental death and disability insurance.  He does not say he bought the insurance much less when, from whom, or for how long.

      Gonzalez is twenty-two years old.  He was born in Mexico and has lived in the United States since 2000.  He has not graduated from high school, speaks limited English, and worked as a painter before being hurt in a car accident in 2008.

      Gonzalez would like to be the named plaintiff in a class action.  The class, he says, consists of ethnically Hispanic people whose native language is Spanish, who have not earned a college degree, and whose average monthly checking-account balance is under $5,000.

      Having already amended his complaint, Gonzalez describes the defendants' actions that he says violate the law.  He says that the defendants "misused" information about him and others like him to "foist" on them "useless" accidental death and disability insurance.

The Bank's deposit agreement incorporates its privacy policy.  In it, the Bank agrees not to share customer information with outsiders, but it says it might share customer information "among our companies" or with "companies that work for us."

Gonzalez says that the Bank gave the demographic profiles of customers like him to Intersections, Inc., a telemarketer.  Intersections, he says, sometimes conveyed it to Global Contact Services, LLC, another telemarketer. A Spanish-speaking salesman would call to sell the insurance.  When a person chose to buy it, the salesman would record that part of the conversation.

According to Gonzalez, Intersections withdrew monthly premiums from the buyers' accounts.  The bank statements, however, show that payments go to a company called Smart Step.  Smart Step, he says, is the Bank's partner that sells the insurance.  The complaint does not reconcile its contradictory accusations about who withdrew the premiums even though Gonzales got statements every month.

The insurance companies say that National Union Fire Insurance Company of Pittsburgh, PA, is a wholly owned subsidiary of American International Group, Inc.  They say that the Bank is the named insured on a blanket policy; the Bank then uses third-party marketing agreements to sell the insurance to its customers.  After a customer buys the insurance, National Union sends a "description of coverage" and administers claims.

In his complaint, Gonzalez does not say that (a) people were charged for insurance they did not agree to buy, or (b) people were charged more than the filed and approved rates.

Gonzalez insists that this arrangement is actionable on five legal theories: (a) the Racketeer Influenced and Corrupt Organizations Act, (b) breach of contract, (c) breach of fiduciary duty, (d) common law fraud, and (e) unjust enrichment.

The defendants have asked the court to dismiss Gonzalez's complaint for failure to state a claim.  Loeb says it should also be dismissed for lack of personal jurisdiction.

3.    *No Injury.*

To have standing, the plaintiff must show that he has suffered an injury in fact.  *Rivera v. Wyeth-Ayerst Labs*, 283 F.3d 315, 318 (5th Cir. 2002).  Also, the named plaintiff who represents a class must "allege and show [that he] personally ha[s] been injured, not that injury has been suffered by other, unidentified members of the class . . ." *Lewis v. Casey*, 518 U.S. 343, 357 (1996).

Gonzalez does not claim that he, directly and individually, was injured; the complaint speaks in generalities about insurance sales, but it fails to link a particular injury to Gonzalez. By not saying that funds were withdrawn from his account beyond his permission or that an insurance claim of his was not honored, Gonzalez has not specified how or whether he was hurt. Without allegations of – at a minimum – an actual, personal financial loss, Gonzalez has not shown an injury necessary for his standing.

Assuming funds were withdrawn from his account, Gonzalez does not claim that he did not receive the coverage he agreed to buy or that he was charged rate he did not agree to pay. He also does not say that the rates were more than those approved by the Texas Department of Insurance.

4.    *Abstract and Vague.*

Not only does Gonzalez not show that he has been injured, his complaint does not indicate wrongdoing by the defendants. Rather, it is nothing more than conclusory allegations that mimic statutory language. He has submitted an abstract complaint, devoid of facts detailing each defendant's conduct.

A.    *Loeb Holding.*

Loeb Holding is incorporated in Maryland with headquarters in New York. Loeb is an investor in Intersections but not its parent.

Gonzalez's sole accusation against Loeb is that it is a "controlling parent" of Intersections, Inc., another defendant. He never specifies what Loeb did to him, whether and how it may have directed Intersections to injure him or a specific wrongful act it committed. He lumps Loeb's name into broad conclusory accusations giving Loeb no indication of what actions it committed that require a defense. Controlling parent is not useful to establish liability; being a parent and being liable for a subsidiary's acts are distinct.

More important, Gonzalez does not show that Loeb has a connection with Texas. In Texas, Loeb does not own property, employee anyone, advertise, occupy an office, meet, or collect mail.

Intersection's Form 10-K says that "insiders have substantial control over us . . . Loeb Holding Corp., which is controlled by one of our directors, owns approximately 42% of our outstanding stock." The form does not say Loeb directed it, nor does Gonzalez does allege that

the ultimate owners did anything to justify the court's collapsing the corporate entities into one or making the parent amenable to jurisdiction in Texas. Gonzalez concedes in his response to the motions to dismiss that he lacks sufficient information to know whether it amounts to enough for jurisdiction. The law requires Gonzales to investigate the facts and law of his complaint before filing it; it sanctions those who sue first and ask questions later. Because Gonzalez does not describe Loeb's acts of direct liability or how Intersections could be its alter ego, Gonzalez has not made a *prima facie* showing of personal jurisdiction.

Without more, accusing Loeb of being a "controlling parent" does not state a claim against Loeb, nor does it establish jurisdiction over it. He implicitly admits that he cannot explain why Loeb was included.

B.   *Global.*

Global is a telemarketer. Gonzalez does not say that he spoke to a telemarketer, much less that he spoke specifically to one hired by Global. The complaint generically says "when someone meeting Jorge Gonzalez's description opens a checking account at the Bank, the bank conveys" his information to Intersections. Intersections "then usually engages a telemarketing company, often [Global], to have a trained telemarketer, a native Spanish speaker . . . call the . . . depositor . . . and convince the depositor to authorize, over the phone, the purchase of some form of insurance."

First, Gonzalez has not established a connection between himself and Global. Without describing a real conversation that he had with Global, he has not stated a claim against Global.

Second, assuming Gonzalez did purchase the insurance after a conversation with Global, the complaint fails to show how this is actionable. The complaint includes facts that describe noting. It says: "a native *Spanish* speaker . . . call[s] the *unsuspecting* depositor . . . and *convince[s]* the depositor to authorize, *over the phone*, the purchase of *some form* of insurance. . . . The telemarketers are *trained* to *trumpet* the high value and low cost of the insurance protection being offered. They make the offer just *too good* to pass up." Rather than showing illegality, Gonzalez describes the role of a salesmen. The emotive imprecision betrays the emptiness of the claim.

Of course the value of the deal will be emphasized. Of course the salesperson will try to convince the customer that he is making a great decision. Convincing people to buy a produce is what salespeople do. Further, while not required, the salesman spoke in the customers'

native language, something that should be encouraged, not discouraged. Lawsuits have been filed when the salesman did not speak in the customer's native tongue.

Later in the complaint, Gonzalez says Global and other telemarketers "use false, misleading and high-pressure sales scripts to induce victims . . . to purchase." Yet, nowhere does Gonzalez recite a misrepresentation that Global supposedly made – a minimum requirement to state a claim for fraud.

C.   *Intersections and Intersections Insurance Services, Inc.*

As best the court can gather from the complaint and other papers, Intersections is a company hired by the Bank to offer insurance to its customers and that it subcontracted some of its responsibilities. Gonzalez complains that the Bank allows Intersections to withdraw funds from some customers' accounts, yet acknowledges that these people all agreed to buy the insurance through the deductions. Because the customers bought the insurance and gave authority for their accounts to be debited for premium installments, Intersections is permitted to do so. This is not illegal; it is efficient.

Other than being a subsidiary of Intersections, the complaint gives no indication of Services's role. It has only conclusory allegations that track statutory language. For example, Gonzalez says "Intersections Insurance Services, Inc.[,] and BA Insurance Services, Inc., deceptively and fraudulently obtains the personal information of vulnerable Bank of America checking account owners . . . ." Left unanswered is the content of the information, how Services acquired it, how Services shared it, and Services distinction from Intersections. He omits an identification of any of the elements of fraud from an intentional misstatement of a present fact through the others to aan injury consequent on the reasonable reliance.

Because the complaint contains no hint, no clue about Services actual participation, if it did, Gonzalez has pleaded no claim against it. No one on the downside of the versus has information about the customers except that that they divulged by the customers to the Bank or to the marketer. It was obtained in a consensual, mutually beneficial business transaction.

D.   *American International Group and National Union Fire Insurance Company.*

American and National Union are insurance companies. Gonzalez says American and National Union issued coverage with limits of $100,000 for accidental death and disability

insurance to people who consented.  The insurance companies clarify that American is a holding company for National Union, the underwriter.

Because American is a holding company and does not underwrite or market the insurance, it is improvidently joined.

Gonzalez does not say in his amended complaint that National Union insured him. Rather, he says broadly that when some customer agrees to purchase the insurance and that either America or National Union sends a description of coverage.  According to Gonzalez, the description varied from the master policy; he, however, does not say how it varied and whether the variation was material or detrimental.  More important, Gonzalez does not say the policies vary from filed rates, that he received less coverage than he bought, or what the insurance companies told him that could have been lies.

Boiled down, his accusations are that American and National sold insurance through a typical marketing arrangement with the Bank.  He does not say he did not receive the coverage he might have agreed to and paid for.  On his own facts, assuming that he bought something from somebody, the court cannot see how Gonzalez could have been hurt by correct insurance defendant, National.

     E.    *Bank of America, NA., Bank of America Insurance Services, Inc., and BA Insurance Services, Inc.*

Bank of America, NA, is, according to Gonzalez, a bank headquartered in Charlotte, North Carolina.  Gonzalez says  Bank of America Insurance Services, Inc., is the Bank's subsidiary and an insurance plan administrator for it.  He says BA Insurance Services, Inc., is a subsidiary of the Bank that "provides insurance related services."

In his complaint, Gonzalez never describes what exactly Bank of America Insurance Services or BA Insurance Services does or how each specifically contributed to his imagined scheme.  His most specific fact is that the Bank disclosed to him in its privacy policy that they are "companies that have consumer-customer relationships with Bank of America."

Overall, Gonzalez accuses the Bank and its subsidiaries of masterminding the whole arrangement and participating in nearly every aspect of it.  At best he describes a business relationship on the offerors' side and that some people willingly consented to accept the insurance that they were offered because of it.

4.    *Racketeer Influenced and Corrupt Organizations Act.*

Gonzalez says the nine defendants violated section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act – that they conducted "affairs" through a pattern of racketeering activity.   Essential components include (a) conduct, (b) of an enterprise, (c) through a pattern, (d) of racketeering activity.   He also accuses some or all of the defendants of a conspiracy to commit RICO.

A.    *Pattern of Racketeering Activity.*

A pattern of racketeering activity requires that   *each* defendant commit at least two predicate acts within ten years. 18 U.S.C. § 1961(5); *In re Burzynski*, 989 F.2d 733, 742 (5th Cir. 1993).   Gonzalez says that the defendants' predicate acts consist of mail fraud, wire fraud, violations of the Access Device Fraud Act, the Telemarketers and Consumer Fraud and Abuse Prevention Act, and its implementing regulations, the Telemarketing Sales Rule.

(1)    *Fraud.*

The Wire Fraud Act bans people from calling across state lines to plan or conduct fraudulent schemes.   18 U.S.C. § 1343.   The Mail Fraud Act bans people from using the mail to do the same.   18 U.S.C. § 1341.   To prove a scheme to defraud, the complainer must show fraudulent activity. *United States v. Stephens*, 571 F.3d 401, 404 (5th Cir. 2009).   In the statute, fraud retains its common-law meaning, and at common law, fraud requires, at minimum, a material misrepresentation or omission to someone who relied on it reasonably and was deprived of property. *See Neder v. United States*, 527 U.S. 1, 21-22 (1999).   *See also Joe N. Pratt Ins. v. Doane*, 2008 WL 819011, at *4 (S.D. Tex. March 20, 2008).

Additionally, mail and wire fraud must be pleaded with particularity. Fed. R. Civ. P. 9(b). Gonzalez must specify the content of the statements or omissions considered to be fraudulent and the identity of the speaker, the time, and place. *Tel-Phonic Serv., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1138-39 (5th Cir. 1992).

(a)    *Wire.*

Gonzalez says the Bank committed wire fraud by posting misrepresentations on its website about its privacy policy, security protections, products, and services.

Gonzalez says telemarketers like Global – directed by the Intersections entities or Loeb – called Gonzalez "through fraudulent practices" and used false and misleading scripts to convinced him to purchase the insurance.  The complaint says the telemarketers offered the customer a free trial and, when he consented, he was sent a description of coverage and insurance coverage before the first premium was withdrawn.

Nowhere does the complaint identify a single lie told to the customer.  He does not identify the person or company with whom he may have spoken, or that he personally spoke with anyone at all.  Gonzalez broadly accuses Intersections, Loeb, Global, and their related companies but never specifies how each participated or whether anyone communicated to him directly.

The amended complaint then accuses the defendants of committing wire fraud by violating the Telemarketers and Consumer Fraud and Abuse Prevention Act and the Telemarketing Sales Rule.  15 U.S.C. § 6101 et seq.; 16 C.F.R. §310.

 First, the this is a civil statute and regulation.  Violating the Telemarketers and Consumer Fraud and Abuse Prevention Act and rule is not a crime; a violation does not become wire fraud, and it may not be the basis of a RICO claim.  Second, Gonzalez has not identified a misrepresentation made.  Third, private individuals may only bring a claim under this act in  specific circumstances.  Normally, these actions are brought by the state attorneys general or the Federal Trade Commission.  A person like Gonzalez may only sue under the act when he has suffered $50,000 in actual damages and has given prior written notice to the Federal Trade Commission.  Gonzalez's complaint does not show that he has done either.  Because he has not described a misrepresentation and because he has not met his prerequisites under the act, Gonzalez has not alleged a claim under the Telemarketers and Consumer Fraud and Abuse Prevention Act even if it were a RICO predicate act.

(b)   *Mail.*

Gonzalez says all defendants have used the mail in executing their "scheme."  The six examples, however, are abysmally insufficient.  The first three do no more than describe the Bank's privacy policy; conspicuously absent is any link to the mail.  Amended Complaint ¶ 65 (a), (b), and (c).  In the other three examples, Gonzalez notes that statements, invoices, letters, and documents have been mailed.  Amended Complaint ¶ 65 (d), (e), and (f).  He does not, however, identify the speaker, time, place, or content of the alleged misrepresentation.  Nor

does he show that or how these documents furthered a scheme, much less a fraudulent one. His main contention seems to be that the description of coverage does not match the master policy, but he does not point out a "material" difference or describe how this was fraudulent.

         (c)   *Fraud Conclusion.*

      Under Rule 9(b), the heightened pleading standard, fraud must be described thoroughly. The defendants are not required to guess what statements were made in connection with the sale and how and why they are fraudulent. Gonzalez has not supplied particulars to meet the higher pleading standard for fraud.

      Gonzalez's complaint does not specify each defendant's conduct. It gives no clue as to what each defendant's role was and how it participated. "General allegations, which lump all defendants together and fail to segregate the alleged wrongdoing of one from those of another, cannot meet the requirements of Rule 9(b)." *Patel v. Holiday Hospitality Franchising, Inc.*, 172 F.Supp. 2d 821, 824 (N.D. Tex. 2001). *See also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).

         (2)   *Access Devices.*

      Gonzalez says the Bank, its subsidiaries, American, and National Union violated the act by furnishing account numbers to Intersections and Global. He says Intersections, Global, and other unnamed telemarketers violated the Access Devices Act by obtaining account numbers with the intent to defraud. His allegations track the statutory language.

      The complaint does not specify which account numbers are the devices – the customer's checking account numbers or insurance account numbers. The court assumes the "account numbers" at issue are checking account numbers, because the complaint refers to "payment via the unauthorized access devices."

      To violate the Access Devices Act, the device – here, the account numbers – must be unauthorized. Unauthorized access devices are those that are lost, stolen, canceled, or obtained with the intent to defraud. 18 U.S.C.S §1029.

      The complaint acknowledges that the customers agreed to purchase the insurance; they consented to automatic withdrawals from their accounts with the sharing of their account information. Accordingly, the account numbers were authorized. The complaint never says Gonzales – or anyone else – was not given the insurance he purchased or was charged more

than he authorized.   *See U.S. v. Luttrell*, 889 F.2d 806, 810 (9th Cir. 1989).  Moreover, the Bank cannot unlawfully "obtain" account numbers it issues.

Gonzalez's own complaint contradicts his accusation that the account numbers were used without authorization.  He has not pleaded a violation of the Access Devices Act by any defendant.

### (3)   *No Predicate Act.*

Not only do each of predicate acts Gonzalez claims underlie his RICO theory have no merit, his complaint contains no facts showing that *each* of the nine defendants committed at least two of the predicate acts.  Consequently, he has not pleaded a violation of RICO.

### B.   *Enterprise.*

Gonzalez says the nine defendants are an "association-in-fact" enterprise consisting of the nine defendants or fewer than  nine.  To support his claim of an association-in-fact, Gonzalez must plead plead facts showing that it (a) has an existence separate and apart from the pattern of racketeering, (b) is an ongoing organization, and (c) functions as a continuing unit as shown by a hierarchical or consensual decision making structure. *Crowe v. Henry*, 43 F.3d 198, 205 (5th Cir. 1995).

### (1)   *No Separate Existence.*

Gonzalez has not pleaded specific facts which establish that the association exists for purposes other than simply to commit the imaginary predicate acts. *Elliott v. Foufas*, 867 F.2d 881, 5th Cir. 1989).  At most, he has accused the defendants of engaging in their normal course of business.

### (2)   *No Structure.*

Gonzalez does not have a single fact showing that the defendants operate in as a continuing unit with a hierarchical or consensual decision-making structure.  At best, some of the defendants had separate roles in the selling of insurance, but each party's conducting of its own affairs is not hierarchical or consensual decision making or an ongoing organization.  *In re MasterCard Intern.*, 132 F. Supp. 2d 468, 487 (E.D. Louisiana 2001). Nothing suggests the

defendants participated in a hierarchy beyond their contractual relationships – if the defendant had a role at all.  Gonzalez's allegations are conclusory and empty.

C.    *Conduct.*

Section 1962(c) requires that each defendant must participate in the operation or management of the enterprise itself. *Reeves v. Ernsh & Young*, 507 U.S. 170 (1993). Participation means direction, in some part, an enterprise's affairs.

Gonzalez says the defendants contributed to the enterprise "with the knowledge of or willful disregard" for the other defendants' supposed criminal activity.  Simple contributions – if any – are not enough.  Gonzalez has not pleaded – much less proved – the operation or management of the supposed enterprise by a single defendant, much less all.

D.    *Conspiracy.*

In addition to claiming all the defendants violated RICO, Gonzalez also says they conspired to do so.  His complaint, however, does not specifically say what the agreement was, who entered into it, or the actions taken in furtherance of it.  He had described only a general business arrangement – no nefarious plot.

5.    *Breach of Contract.*

Gonzalez says the Bank breached its contract.  He does not specify the contract or the promises The Bank may have made.  He says "Bank of America became obligated both explicitly and implicitly to comply with certain constraints, not the least of which were to permit withdrawals from those accounts only upon the depositors' authorizations and to comply with its own announced 'Privacy Policy for Consumers . . .'"  That accusation does not contain the elements needed to describe a breach of contract.  He specifies no act by the bank that contravenes a term of which contract and how it harmed him.

6.    *Good Faith and Fair Dealing.*

Gonzalez says the Bank is guilty of breaching a duty of good faith and fair dealing that it owed to him, but he has not described a relationship between the Bank and himself that would make it his fiduciary.  He has stated no claim against the Bank for breach of good faith and fair dealing.

7.    *Common Law Fraud.*

Gonzalez says all defendants committed common law fraud, but as discussed in the RICO section he has not pled fraud with particularity. He does not identify the speaker, time, place, or content of a fraudulent misrepresentation made to him – much less reasonable reliance to his detriment.

8.    *Unjust Enrichment.*

Gonzalez says all of the defendants have been unjustly enriched by "misappropriating, disclosing, selling and wrongfully capitalizing on [his] private and confidential information."

Unjust enrichment arises in equity and results from one's failure to pay for benefits wrongfully obtained. *See Heldenfels Bros. Inc. v. Corpus Christi*, 832 S.W.2d 39, 42 (Tex. 1992). It is used to permit recovery in equity where neither a contract or tort exists; it is a legal theory that implies a promise. More important for Gonzales, the doctrine of unjust enrichment does not rescue a party from the consequences of a bad bargain. *Burlington Northern R.R. Co. v. Southwestern Elec. Power Co.*, 925 S.W.2d 92, 96-97 (Tex. App. – Texarkana 1996).

Assuming Gonzalez did agree to purchase the insurance, he may not under the label unjust enrichment escape the consequences of that decision – having paid the premiums – because he now thinks he paid too much for it. He never says he was charged more than he authorized or more than the scheduled or advertised rate. He does not say he did not receive the coverage. If he was unhappy, he could and should have canceled his policy.

Gonzalez says the money withdrawn from customer accounts was for items other than premiums. He is wrong. In insurance, as in all transactions, every cost of the seller is borne by the consumer. To illustrate, people often say that illegal immigrants do not pay taxes. When an illegal immigrant from, say, Luxemburg buys a beer at a local convenience store, he obviously pays the sales and alcohol taxes. The money he hands to the clerk is the source for the clerk's income and payroll taxes as well as the owner's franchise, property, income, and payroll taxes. It pays the clerk's landlord's property taxes. It pays the efficient and the wasteful steps that go into the result. Since it pays, the owner's personal income, the price of the beer pays for his vacation, 42-inch television, and BMW. It pays for the clerk's remittances to his family in New Zealand.

A premium pays for all of the costs that a company arranges to be able to offer the insurance for sale. Gonzales says that authorizing a deduction for insurance premiums only

extends to the net amount required by the actuarial calculation on expected loss. An insurance premium is the retail price of a financial service, and it includes everything especially sales costs. Whether it is a financial "product" or a used car, if it is not sold no one in its creation eats. When the portions are paid to the participants does not affect their legitimacy.

At any rate, Gonzalez has not explained how this practice is results in an improper benefit.

Additionally, the enrichment of one party is not unjust where it is permitted under an express agreement. *Id*. Here, the debiting of accounts was not wrongful because nothing was taken without the customer's permission. Nor was the sharing of customer information – names and telephone numbers  – wrongful because (a) the Bank disclosed that it might do it and (b) Gonzalez has not identified the benefit the Bank or the other eight defendants from information they may have shared.

Gonzalez has not described a viable request for restitution under the theory of unjust enrichment.


9. *Conclusion*.

Although amended already, Gonzalez's complaint is a 32-page mask of conclusion to cover its emptiness. It is unorganized, imprecise, and contradictory – amounting to nothing more than a populist press release to reap rewards from an ordinary, proper consumer relationship that he and others may have made. Because his has not and cannot state a claim, his case will be dismissed.

Gonzales did not create this waste of the public's and defendant's resources. His complaint was mediated by a lawyer, a lawyer who did not or cannot do the rigorous researching and thinking – the work of mastering facts and analyzing law.

Gonzales will take nothing by his claims because, in his amended complaint, he has been unable to state a claim.  This conclusion disposes of all of the parties; however, Loeb is also not amenable to jurisdiction on this claim in Texas, and that objection by it to these proceedings is preserved as a contingency.

Signed on February 20, 2011, at Houston, Texas.

_____
Lynn N. Hughes
United States District Judge